Thank you and good morning, Your Honors. It's a pleasure to be here. My name is Andy Forsyth. I'm an attorney from Billings, Monsanto. I represent and am defending two gentlemen in this case. I'm defending John House and John Huntley. There was a little procedural confusion in the case, so perhaps by preface I'll say there is a third defendant, Fallon County, which had appealed, but this Court has decided that appeal was not appropriate. So they remain in the case, but they're not here today appealing any issue for the Court. John House was the county attorney of Fallon County, Montana, in 1998 when this case occurred. He appointed John Huntley, a Montana attorney, as special prosecutor. The case arises from the prosecution of a police officer in Fallon County, a police officer who worked for the town of Baker. This is an appeal, it's an interlocutory appeal, of a denial of immunity to my clients. And it's an appeal of the denial of immunity to my clients, Huntley and House, on the 1983 or Section 1983 claim pled against them. There are two state tort claims pled against them in the case below. Those are not appealed here today. The case against my clients arises from a Section 1983 claim asserting improprieties in the investigation and prosecution of Mr. Stinnett. Count 3 of the Second Amended Complaint alleges that Mr. Stinnett's rights were violated in two regards. One, that his Fourth Amendment right to be free of improper seizure was violated, and two, that his right to be free from criminal charges on the basis of false evidence that was deliberately fabricated under the Fourteenth Amendment. Let me briefly outline what happened. In July of 1998, the Fallon County attorney, John Huntley, became aware of concerns about Officer Stinnett. He officially appointed a special prosecutor under a procedure Montana law allows, an attorney in private practice, John House. The appointment document said, quote, or rather that he was to, quote, investigate and possibly prosecute, unquote, Officer Stinnett. This is a rural eastern Montana county, and I'm sure it may sound a little odd to this Court that an attorney would be charged to both do some investigation and to prosecute. That was nonetheless the procedure followed. Mr. House, the special prosecutor, received some initial direction from John Huntley, the county attorney, got some names of people to talk to, a brief description of some of the concerns about Officer Stinnett that the county attorney had heard. John House, the special prosecutor, did interview witnesses. He took some statements. He took some recorded statements. He took notes. He followed some leads that the witnesses gave him. He concluded that there was probable cause to file criminal charges, and he prepared initial charging documents. Let me briefly go through how that works under Montana law. There is the grand jury option. It wasn't followed here. Mr. House followed the other option. He filed a motion for permission from the district court to file a charging document. We call that a criminal information in Montana. The district court must pass on probable cause, and the prosecuting attorney must present an affidavit, a sworn affidavit, to establish probable cause. Is a preliminary hearing required? No, Your Honor. Just on affidavits? Well, I'm sorry. Yeah, there can be a hearing on the affidavit. Mr. House, the special prosecutor, signed the affidavit in this case. There is authority under Montana law that our law authorizes a prosecutor to sign such an affidavit. I don't find authority in Montana law that it must be a prosecutor who signs. I, therefore, would assume that a witness would sign. There is a statute that authorizes the employment of special prosecutors. Yes, Your Honor. Then does the statute carry over and say they have any rights? Well, they then have the – they then serve the function of a prosecutor, of a statutory prosecutor. So they are a hired public prosecutor for a specific, I guess, case or incident. So Mr. House signed in total two motions and sworn affidavits. And in the sworn affidavits, he recited facts that had been made known to him from witnesses he had interviewed and asserted the facts were true to the best of his knowledge. The court, in response, in the first information filed in early August of 1998, found probable cause for all but two of the charges sought, and the criminal information was then filed. Mr. House investigated further, and on October 5, he filed a second motion and affidavit seeking further charges. The court granted permission to file all of those charges, and a second criminal information was filed. And it was filed October 5. The police chief in Fowling County was concerned and felt that these charges were inappropriate, contacted Montana's attorney general. Montana's a small state, and to do that in our state, you call the attorney general. And Joe Mazurek, the attorney general, by letter dated October 30, ordered the special prosecutor, John House, and the county attorney, John Huntley, and he had full authority under Montana law to do so as the attorney general for the state of Montana. He ordered them to cease investigating, file no further charges, and present the file for review to his office. This was done. Approximately five weeks later, the attorney general's office dismissed all the charges. And that ended the prosecution. When the charges were brought, Officer Stinnett was not arrested. He voluntarily appeared in court at arraignment, and two conditions asserted by Mr. Stinnett that are material here were imposed on him. The first condition was he must report to his attorney weekly. The second condition was that he was not allowed to leave the state of Montana without the district court's permission. Was this a verbal order by the trial judge? It was a verbal order by the trial judge in open court. Was it written down in the minutes of the court? It is in the court minutes, and those minutes are in the record. And was it ever – was any attempt ever made to enforce any part of that order? Mr. Stinnett, in his deposition testimony, said he never sought the court's permission to leave the state. So it never – that part never came up. It may be a moot question if he never – He never asked, you know, why leave Montana? Unless you can come to Seattle. Why leave Montana? You're already there. So I'd like to give you the structure of our position here with respect to both of my defendants, John Huntley, the county attorney, and Mr. House, the special prosecutor. I want to explore what they did that may be covered by prosecutorial immunity and what may be covered by qualified immunity if prosecutorial immunity doesn't apply. Now, don't use your whole 20 minutes on that because we know something about that. I suspect you know more than I do, and I'm trying to study up on that. Let me then just – Mr. House, at least, when he's doing investigations, is outside of absolute immunity. I think – I mean, he's got a qualified immunity, but it's hard for me to see that is prosecutorial under the Supreme Court's precedent or ours. Well, I think under the Kalina case, the U.S. Supreme Court case, when he signed the affidavit, there is an issue of his stepping into the role of witness. I think that in his investigation, some of what he did could fairly be called what a police officer in a larger town or city would do. And I think that there is a – How about your client for a moment, Mr. Huntley, and then we'll come back to Mr. House. Does Mr. Huntley have a position that as a county prosecutor, everything he did, passing on – I know he passed on information frequently, but can that all be viewed as a prosecutor's role? I think much of what he did and some perhaps not. And maybe if I could make my case for much of what he did. First, a point that I would like to be able to make to the Court is that the facts the plaintiff puts forward for Mr. Huntley, the county attorney's wrongdoing, are few and general. And I think they are inadequate to overcome the defendant's motion. But let's talk about the few and general facts he says. And this is from my opponent's brief. He talked to some witnesses. He passed on that information to Mr. House. He conferred with House about the case. There isn't any detail on the substance of those conferences, but there is testimony from both gentlemen that they talked. They talked on the phone like lawyers do about the case. And he faxed some documents to House to look at, and he obtained an NCIC report on one of the witnesses. When the county attorney, Mr. Huntley, and, for example, I cited some of his testimony in the briefs. It's a small county. He was at the fair. He testified. People came up and gave him some complaints about Officer Stinnett. So he said he'd look into it, and he passed those complaints and the names of those people and what they said on to Mr. House, the special prosecutor. I think that's a close call, whether that's in a rural Montana county, when a county attorney does that, whether that's in the county attorney's role as someone obliged to consider whether a criminal investigation should commence or not. I do, I certainly agree that investigating facts and talking to witnesses is a police-type function and outside the role of the prosecutor. I think there's some gray area, but I will concede that there is some area of Huntley's activity that probably gets into talking to witnesses maybe beyond what a county attorney there would do. Where I think the plaintiff's case fails against Mr. Huntley, though, is that there is no specific allegation of any wrongdoing on his part in that role. There's no allegation that he did anything wrong talking to people at the fair and passing the names and stories on to John House, the special prosecutor. If he did, then we would have a qualified immunity question for Mr. Huntley. If we look at a qualified immunity issue for Mr. Huntley, then I think that the – and really I wanted to talk a little in the time I've got about the Fourth Amendment claim versus the fabricated evidence claim, the two constitutional issues. It's my position that in 1998, it wasn't clearly established that the restraint on out-of-state travel was a seizure under the Fourth Amendment. And if it wasn't clearly established, then there could be no basis for a 1983 claim for the seizure. And just to – Well, if there's no evidence that he was ever actually restrained, why would we want to reach that question? Well, my opponent has asserted that there was a Fourth Amendment seizure in that he was forbidden from leaving the state of Montana without the judge's approval. Well, somebody – suppose somebody told him, go talk to strangers. Is that a restraint? I don't find that one in the cases I've reviewed. I don't think so. He doesn't come in with some evidence that he was actually restrained. I don't know why we should write an advisory opinion on what might happen in a hypothetical case. But we haven't heard from the plaintiffs yet. Well, I appreciate that. And I think there is not, in fact, a basis for the Fourth Amendment claim, based on the restrictions that were imposed on him. I will tell you that in 1997, one circuit in the East had found a restriction on interstate travel like that to be a seizure. I think somebody's been watching too much television. The cops always say that in television. But my point, I guess, is that a couple of other circuits have said, no, it's not a seizure. And if the point is unsettled, then I don't think a state actor in 1998 can be held to have reasonably concluded that a restriction on interstate travel without court's permission. Well, one of the cases that one of the things that's bothering me here is in these affidavits. If you get the nuances between the outer side and the inner side, Bernie busy hands is around touching high school girls. Then you get into some interesting questions. Yes. And I'd like to set Mr. Huntley aside because I really think Mr. Huntley knows nothing about size. No, he had nothing to do with the affidavits and did not talk to those witnesses. And I think Mr. Huntley, I don't think there's evidence that Mr. Huntley violated Mr. Stitt's rights or did anything. Well, it's pretty clearly established constitutional right that the prosecutor not sort of stack the deck, you know, come up with phony evidence. That is. Because he said that's the contention, whether or not it can be proven. It seems like they've got a clearly established right that's being asserted. I agree. This Court in Devereaux, and that's the case I tend to use as guidance, this Court has held in Devereaux v. Abbey being subjected to criminal charges on the basis of false evidence that was deliberately fabricated violates the Fourteenth Amendment right. And I, we certainly agree with that. And so we think the focus of the case is probably most appropriately on is there evidence before the Court that there was deliberate fabrication of evidence, and not only deliberate fabrication of evidence. And here we're going to focus on Mr. House and his affidavits because he signed them. Not only deliberate fabrication of evidence, but such that, but for the fabricated evidence, reasonable cause would not be present. And therefore, criminal charges resulted because ultimately it isn't just the fabricated evidence, but the fact that they result in subjecting someone to criminal charges. That is at issue. The debate then, at least in my mind, shifts to a close look at the affidavits. And I think the touching of the thighs is a good place to start since you brought it up. The affidavit says that a young girl claimed that officers thinned it while talking to her touched her upper thigh. The affidavit uses the word upper inner thigh. It is true that the girl's statement simply said upper thigh. And what kind of statement are we talking about from the girl? Is it recorded or? It's recorded. And it's the statement's in the record, and I cited it in my brief. You certainly, and I do invite and ask the Court to compare the statement in the record with the affidavit that Mr. House filed. And the difference is upper thigh versus upper inner thigh. My point to Your Honors would be that for the charge of sexual assault under Montana law, you don't, there isn't a difference between upper and upper inner thigh. Our statute does not require touching of genitalia. I don't see a lot of coaches patting people's fannies on the coming out of a huddle and so on. That's touching the thigh, but it isn't necessarily aggressive. Sexual assault. No. Well, that's true. And I, I guess I don't want to comment over much on the statute other than the statute's broad, and one would wonder about loss of situations. I can only tell you Montana law doesn't require the touching of private parts. At this stage of the proceedings, has Mr. House given an explanation of, in the record, of why it says inner thigh rather than just thigh? I mean, you know, as you said, well, I had another talk with her, or, gee, I just, that's what I thought. I didn't check back. I don't want to record bear on that. I don't recall that being explained in the record. I guess when, when I wrote my brief to the court and I looked at her statement, I thought it was clear that she felt offended and threatened by the policeman's behavior. Took her into a private room. She was 15 years old. Talked to her for 15 minutes. Had his hands on her upper thigh. Made her very uncomfortable. Now, I guess my point is, why did he add inner? He shouldn't have. Did that make the difference between probable cause or not under our law? I don't think so. Of course, this is one of the reasons courts have tried to set their face against interlocutory appeals, because you don't have a fully fleshed out. You don't have a fully developed record. Yeah. But anyway. And I understand that. We have to take this kind, though. That's the law of the circuit. Yeah, you have to take these. So here we are. Yeah. And you actually invited me to come talk to you, so I appreciate that, too. Well, this is kind of a case where oral argument is helpful. I appreciate that. And I see my time's almost done, so I do think a reasonable focus here is on that affidavit and how certain elements of the affidavit may have departed from the statements that are in the record. The statements are all in the record. The affidavit's in the record. It's tedious, but in my brief, I tried to say here's the affidavit, here's the statement. I think much of it has to do with the prosecutor interpreting the events, but I don't think he went beyond interpretation of the events all the way into deliberate fabrication of evidence. And I also think that if you read through the kind of the allegation of falsehood versus the statement and the affidavit language itself, for the most part, it is perhaps a little sloppy. It is perhaps at times an interpretation, but does not reach the standard of deliberate falsification of evidence. And for prosecutors and special assistant prosecutors, qualified immunity is an important subject to them in a case like this because, of course, they're exposed to litigation, including public trial, if they're not accorded their immunity. Just to briefly categorize in my few seconds. Kennedy. If you need a couple of minutes extra, we'll let you have it and add it to Mr. Jerusey as well. Okay. I appreciate that. I'll keep it brief, Mr. Chairman. It's hard when you have two clients and a lot of issues. I appreciate that. And I'll stick my deck out and do that, although Mr. Jerusey is a very clever lawyer and I hate to see him get more time. Let me just give you an example. Substantial emotional distress versus language in the statement is another good example. In our statute, which deals with stalking, and you'll get the tenor of some of the affidavits here, are what Mr. House at least felt was a two-year interest in some young gals around town. So there were some stalking complaints. We have a statute in Montana Criminal Stalking Statute. Following someone can be criminal. One of the elements is that the person being stalked feels substantial emotional distress. It is true that the girls in their affidavits did not use the phrase substantial emotional distress. It may also be true that an artful investigator would be able to explain that standard to such a witness and find out whether the witness indeed felt that. But I submit to you that if you look at the girls' statements, they were a set. And there is an interpretation going on but a basis for the affidavit to say. And he talked in one case not only with the girl but with the father. And if you look at the father's statement, I don't think he used the words substantial emotional distress either, but the distress was there. So he interpreted. There is a statement that House omitted some key facts. For example, he didn't explain that one complainant, Jeff Weissman, who was irritated at the officer's treatment of him during an investigation and arrest, didn't explain that Mr. Weissman was drunk at the time in the affidavit. That's an omission. It may have been something that it would have been more fair for Mr. House to advise the judge in considering probable cause, but it's not an element of the offense. So I don't think it rises to the level of deliberate fabrication. I'm going to. If you could sum up now on the next. I will. That I think really I think to sum up, that's the tenor of the difference between the statements and the affidavits. And I submit to you under the Devereaux standard, it does not rise to the level of deliberate fabrication. And I submit to you under a couple of other cases cited, and they're in the briefs. I won't try to find them for you now. Omissions don't count as deliberate fabrication generally. And something short of recklessness with regard for the witness version of events, which bears faithfulness to the witness's version of events, should avoid the kind of deliberate fabrication standard that Devereaux sets forth. And that concludes my presentation. Thank you very much. We appreciate your argument, Mr. Forsythe. We'll now hear from Mr. Gerussi on behalf of the appellee. And we'll set this at 23 minutes, so we're being fair on each side. But you don't have to use every minute of it if you don't need it. I will work through in a diligent manner. I'm Gene Gerussi from Billings, representing Russell Stinnett here this morning. I think I appreciate Mr. Forsythe's comments, but I think the better way to approach this case is in a methodical, paint-by-the-numbers approach. And when such approach is employed, there is far, far sufficient reason to sustain Magistrate Judge Anderson's decision in full. So let's do it. Let's paint by the numbers here. And I think when we do this, the answer comes out in the end. We all know that Section 1983 is not a source of substantive rights. It only provides a method for vindicating federal rights that are elsewhere conferred. That's basic. The first step in such claim is to identify the specific constitutional right allegedly infringed. So let's start here. The first one is the Fourth Amendment claim asserted by Russell Stinnett. To date, this circuit by itself has not been, to date a claim for malicious prosecution by itself has not been recognized in this circuit as giving rise to a Section 1983 claim. However, for more than 20 years, it has been recognized that a malicious prosecution claim which violates a constitutional right does give rise to a 1983 claim. If you go back to the old Klein, that's C-L-I-N-E, versus Russett case, 661 F. 2nd, 108, 1981, the court here held that a malicious prosecution conducted with the intent of denying a person equal protection or otherwise subjects a person to a denial of constitutional rights gives rise to a Section 1983 claim. That's 20 years ago, more than that. And significantly, and it will become obvious in a minute why it's significant, in Klein, that statement was made in the context of where Klein's interest in liberty was impaired. Several years later, in 1987, Usher v. City of Los Angeles again stated that a malicious prosecution claim in and of itself isn't a 1983 claim, but if the malicious prosecution claim impairs a person's constitutional rights, it gives rise to a 1983 action. Now, in 1994, the U.S. Supreme Court decided Albright v. Oliver. And in the plurality opinion authorized by Chief Justice Rehnquist, it was found that Albright's claim that his liberty interest to be free from criminal prosecution except upon probable cause must be judged under the Fourth Amendment rather than the due process clause of the Fourteenth Amendment. In a concurring opinion, Justice Kennedy, joined by Justice Thomas, so agreed. So six of the Supreme Court justices held that if there's a claim that impairs the liberty interest, it's got to be judged under the Fourth Amendment. Well, the Fourth Amendment is triggered by the placing him in custody, isn't it? Well, or a seizure. It doesn't have to be custody. If he isn't seized, he just gets a threatening letter or something. That's not a Fourth Amendment. That's true. You have to have a seizure, okay? Well, I don't think there's any doubt about that. If you frame somebody up and he goes into jail, it's a 1983 constitutional case. Or a seizure, I submit, Judge. What if he's arraigned or charged and then he gets out on bail? Is that a seizure if there's a restriction on his liberty? Depending on what the restriction is on the liberty, it has been found that the request that you stay in contact or that you appear for court proceedings, that's not a seizure. But I submit that restriction on the interstate rights to interstate travel is a seizure. But what if it's not an absolute, you can't travel, but you need to inquire and get permission to travel? I think that's a seizure under the circuits that have looked at it, yes. Is that a seizure if there's no request to travel that's denied? Well, remember, a seizure is the giving it, it's the emplacement of authority and the acknowledgement of that authority by the person. I don't think you have to make a run for the border to say, oh, did you really mean it or not? Well, if you're in Montana, it might be different from being in Guam. Guam is an island. If you say don't leave the island, unless he's got a boat or an airplane, he's not going to leave anyway. Right. But in Montana, there are reasons to leave, such as? Montana is such a nice place. Could anyone really claim damages for not being allowed to leave it? I'm partial to my state, proud to be from it, but I guarantee you if you were in Baker, Montana, you would not ask that question. And so the legal construct is if a person's liberty to leave when they want to leave is constrained, that's a seizure. I believe that's a seizure. And this Court should hold, and I'll tell you why in a minute. So since that Albright decision, the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh circuits have all held that if you've got a seizure, that you may be subject to a 1983 action under a Fourth Amendment claim. All right. Now, let's keep going on this particular case. A Fourth Amendment seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied. In order for a seizure to occur, the person must yield to the assertion of authority over them and thereby have his liberty restrained. At the court appearance in Baker, Montana, before Judge Hagel, this is what Judge Hagel, the state trial judge, said to Russell Stinnett. In part, there are certain conditions on your release which automatically apply. And in skipping here, those are that you stay in weekly contact with your attorney, give your attorney a telephone number and address where you can be reached at all times. Also, that you are not to leave the state of Montana without prior written permission of the court. That's on Excerpture Record 683 and 684. Now, it's in this case and that is those restrictions on Russell Stinnett that we contend constitute a seizure. And I think you have to go back to look at the value of the right to interstate travel in our society. It makes it so important. Here, for decades, the U.S. Supreme Court has recognized the right to interstate travel has long been recognized as a fundamental right. The constitutional right to travel from one state to another occupies a position fundamental to the concept of a federal union. In the Sands v. Roe case here in 1999, the court noted, and I think this is significant, the right to interstate travel embraces three different components. The right of a citizen of one state to enter two and leave another state. Second, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second state. And thirdly, for those travelers who would like to become permanent residents, the right to be treated like other citizens of that state. I don't want to interrupt your train of thought because it's interesting, but the question really here is whether one or both of these defendants has some kind of immunity. And if you win on the point that they don't have, then this is all going to go back to the trial court. And the amount of the seizure and how much it was, how much damage and all that's going to be before the jury with proper instructions. And so we don't need to reach that, do we? Well, we don't need to reach the question whether a seizure violates somebody's constitutional rights. That's that's already the law of the circuit. Well, but they're claiming that this prescription on his interstate travel wasn't seen and thus he didn't suffer. Well, if they're immune, that's one thing. If they're not immune, that we may have to reach that. But let me go on to that. What we need to hear about is why they aren't immune or because otherwise we're we're chasing rabbits as far as this particular case is concerned. Well, let's let's get the rabbit because he belongs in the snare. There is no absolute immunity here. First of all, the expert opinion that is part of the record, which I have submitted and Stennett submitted, says that the work that was done by Stennett, excuse me, by Howitz and Huntley, could best be characterized as routine police investigation. And the cases and they're cited in briefs are routine police investigation entitled them to qualified immunity, not complete immunity. You only get complete immunity when you are working on activities intimately associated with the judicial phase of the criminal process. What did Mr. I understand what Mr. Howitz did was investigative. I understand Mr. Huntley passed on some information. But explain to me your client's theory as to why what Mr. Huntley did wasn't solely prosecutorial. That is not absolutely immune because it seems like it could at least be argued that as a county prosecutor, that once he appoints a special prosecutor, he's got some duty to pass on information that comes to him. It would realize he didn't appoint a special prosecutor. He appointed Howitz to investigate and possibly prosecute. So there was no finding. And that's in that initial appointment document, which is in the excerpts of record and referred to in the brief. It's not a finding of probable cause. I accept that correction. But given that, does a county attorney have a duty once he's appointed someone to investigate and possibly prosecute to pass along to that person whatever information comes to his attention? I know of no statute that requires that. In fact, what you need to do is go back into my brief on pages, starts on page 7. And Howitz, in his testimony, he admits that he and Huntley investigated Stennett, that Huntley gave Howitz files. Huntley talked to witnesses and passed the information that he gathered from the witnesses to Howitz. So as the record stands, you think it shows that Huntley had his sleeves rolled up out there investigating with Howitz? Yes. And you'll find in the court's decision, I think it's on excerpt 846 or 847, that he found that Huntley acted hand in glove with Howitz in this investigation. And I want to get to that point because then you're talking about sufficiency of the evidence. And that's a point that comes up in a decision that Judge Lay wrote in the Eighth Circuit. But at this point, Huntley met with Howitz and kept him informed as to what information he had and what he was doing. Howitz provided copies of documents to Huntley and kept Huntley informed as to what he was doing. Huntley told Howitz to talk to particular witnesses who could give him information. They conferred with each other about what information witnesses had. This is all in the excerpts of the record, and I'm just referring to my brief. Let's assume for a moment, without deciding it yet, that both of them go beyond absolute prosecutorial immunity. All right. And the issue we've got is do they have qualified immunity? All right. Let's take Huntley first. What does your client contend Huntley did that would amount to something a reasonable officer or reasonable government official wouldn't do, would know was violating a constitutional right? Well, realize it isn't that you set out to violate a constitutional right. It's that you conduct yourself in a way which causes a violation of somebody's rights. I don't contend that they set out, gee, let's violate his Fourth Amendment rights. Let's violate his Fourteenth Amendment rights. What they started out to do was investigate, and ultimately that investigation ripened into the prosecution. I understand that. But in terms of immunity, the issues may be a little different on qualified immunity as between Huntley and Howitz, because at least with Howitz, you've got some pretty direct evidence. You're saying that he was told by a witness, thigh, and he said inner thigh. Whether there may be an innocent explanation for that or maybe it's not material, but you've got some points like that with Howitz. But I don't see what you've got like that with Huntley. Well, you go back to the investigation that I was just referring to where they were talking to witnesses, where Howitz himself says we investigated this, where Huntley said I did pass information on, where Howitz said he did pass information on to me. So now I'm understanding on that, on those facts, if we accept your client's position, so Huntley is an investigator in part, and he's not absolutely immune. That's true. But still, it could be that the parts of the investigation that he had contact with did not involve any allegation, any setting that your client alleges involves deliberately fabricated evidence. Okay. But then this is where I believe Judge Lay's opinion in Feist v. Simonson, and there's similar decisions here in the Ninth Circuit, too. An appellate court does not have appellate jurisdiction to review denial of summary judgment based on qualified immunity, where the appellate seeks review of the trial court's determination that the evidence is sufficient to support a finding that particular conduct occurred. And Judge Anderson, or Magistrate Judge Anderson, said when he reviewed all of the facts, Huntley acted hand-in-glove with Howitz in conducting the investigation that led to the criminal charges against Spinnett. That's on Excerpt to Record 847. So if you're now going to talk about sufficiency of evidence, I don't believe that's properly before this Court. An appeal from qualified immunity is before the Court in a proper manner when it's an issue of law. Not when it's a question of facts. But the hand-in-glove thing, I mean, to me at least, sounds like it means he was also investigating. Yes. It doesn't mean that he, like, co-signed every report, you know, that everything that Howitz did, he did. Not in common language, it doesn't. I don't know what you would prove at trial. Well, but what you have is two people investigating, which ultimately then Howitz is, as a prosecutor, then filed the criminal charges. And Howitz then, as a witness, signed the affidavits, which have been briefly discussed here today. Right. Is there anything that Huntley, that Howitz in an affidavit said Huntley did, or that the Court found that Huntley did, that involves a characterization of particular evidence that is exaggerated or false in your view? In the affidavit. In other words, if I don't accept your – the argument you just made, which may be correct, and I'll think about that and study Judge Lay's prior opinion. But assuming I get – I go past that, what – is there anything I should look at as to Huntley as something specific that your client contends he did where he should have known he was violating a constitutional right that was clearly established? Well – In other words, in the context here, is there something Huntley did where your client says, we've put in evidence that Huntley should have known there was evidence that was false that was being manufactured? The – the evidence in the – you see, the problem I have is, in the affidavit that ultimately led to the charges, Howitz doesn't say, I did this particular thing, and I did this, and then Huntley did this, and I did this, and Huntley did this. We don't have that interlineate – or that delineation. But we do have the depositions. You do have depositions, that's true. And all of that, and as well as the documents that were gathered by Howitz and Huntley, I mean, the sources there that were taken. But supposing they were just a joint account. They were working together as joint tort accusers. Yes. The – the question of qualified immunity gets down to very specific conduct and what they should know if they – what they should have known about it. And that's – that's a fairly narrow and focused question. Well, and as Judge Anderson said, though, here, Howitz knew or should have known that the information to which he testified in the affidavits. Howitz, yeah. Yes. Not Huntley. Well, but bear with Judge Anderson, because he's looking at all of it in its totality. Was either false, misleading, or incomplete to such a degree that it affected the court's ability to determine what a probable cause. Howitz knew or should have known that the manner in which he conducted the investigation, that the charges against Stinnett were false. And he concluded, Judge Anderson, on excerpt of the record, 847, that Huntley acted hand-in-glove with Howitz in conducting the investigation that led to the criminal charges against Stinnett. So you've got those two, at least in the court's view, when looking at all of the facts and the record that was before him, said, hand-in-glove, these two work together, the ultimate result of which was the criminal prosecution of Russell Stinnett. Now, I need to go back, because I'm bothered quite candidly about the idea you want to – that there's a discussion about evidence and evidence. And it is important, and I just pulled out Judge Lay's opinion because, of course, I caught my attention with the makeup of this panel. But the fact remains that when you're discussing whether or not there's sufficient evidence to say that an event occurred or didn't occur in determining qualified immunity, that that is not something that you can appeal from. If, for example, it was agreed, these are the facts, so that the issue of qualified immunity then becomes, in a sense, a question of law, that's when qualified immunity is appealable. And you cannot discuss, did Howitz really mean it when he wrote upper inner thigh versus upper thigh? You know, what did he mean? It's not in the record, and you start talking about, well, was it careless drafting? That's not before this Court. That's not appropriate because that's not an issue here. That is for a matter for a trial, I submit. The Devereux case 2, which is the Fourteenth Amendment claim, again, gets back to this same thing, that it's well recognized you have a right not to be subjected to criminal – subjected to criminal prosecution based upon falsified evidence and so on. And I believe the same facts, as outlined, I tried to do it in a very deliberate manner in the factual section of this brief, shows that, in fact, that the – that Stinnett did suffer a deprivation of his – of that particular constitutional right, too. And thus, while we could argue, I suppose improperly in my view, whether these guys really meant to, felt like it, were evil in intent, that kind of thing is not proper here. The question is a matter of law. And under the facts, are they entitled to – Is there anything in the record – and I don't want you to go outside the record – but is there anything in the record that – why Huntley thought that – was there some community pressure or people talking about a stalking cop or something that – why Huntley felt that he had to get an outside – or another lawyer to do an investigation which – what, did he feel like he was recused in some way because he worked closely with the local police in investigating other crimes and so on, or – why he brought in somebody from – to be an investigator? I can somewhat address this. I mean, if it's not in the record, I don't care, but I'd be curious. I can address it within the record. I do not believe the record says exactly what it was House – or, excuse me, Huntley believed. But it is in the record that he had, quote, reports. It is in the record that House – excuse me, that Huntley initially called our Montana Attorney General's office. We have a department within that broader department for investigating cases just like this in our small rural communities where everybody knows everybody and it feels uncomfortable. He talked to a man named John Connor, who later did become involved. John Connor is an attorney with that. Connor said, you know, we're too busy, hire somebody else. It is in the record, then, that John Huntley talked to a couple of other county attorneys. I used to practice in Oregon, which is also a small state. In fact, part of Idaho and Montana used to be part of Oregon. But anyway, we used the state police for supplemental investigations. When the local district attorney feels that he doesn't have the staff and he has to work closely with the police department, he doesn't want to be the one that's bugging the policemen and taking their depositions and so on. So is that a possibility in Montana? I don't want to represent that we could go to our highway patrol and have them, which would be the closest thing to a state police force. But we do have something similar, which is what I'm trying to say. The attorney general has a department where they can send people out to our albino. I was wondering if you used an additional police officer, you would never be talking about absolute immunity, prosecutorial immunity. We'd be talking about qualified immunity. Yeah, but realize that qualified, you only when you get absolute immunity, it doesn't matter the title of the person. It's the conduct. It's a functional thing. Yeah, it's a function. And that's why they're only entitled to qualified because the evidence is they were doing routine police investigation. And a policeman would only be entitled to qualified immunity. I think you can tell from our questions that we're primarily concerned here with qualified immunity. Yeah. Okay. I am out of help. I think the time's up. But we appreciated your argument. Did either of the judges have further questions? I think we thank you. Now, Mr. Forsythe, we went beyond your three extra minutes to another minute. If you want one minute, we'll give it to you. One minute and 40 seconds, roughly. Maybe 15 seconds. Okay. I really am only here to suggest that under the record, I'm not trying to tell you that Mr. House and Mr. Huntley greatly distinguished themselves as criminal prosecutors, but I remind you of the standard that this Court has imposed in many qualified immunity cases, only these officials are entitled to qualified immunity unless plainly incompetent or unless they knowingly violated the law. And what I submit to you is that the focus properly should be that Mr. Huntley But if they made up any stories, that's plainly violated the law. You bet. If they made up a story and that resulted in charges, Your Honor, I agree. I don't think Huntley – I don't really think involvement of Huntley's been shown on the record. I think with Mr. House, I ask for a comparison of the affidavit and the statements, and I suggest to you that he did not knowingly fabricate it. Well, he's got the old hand and glove problem. That's all I have. Thank you, Mr. Forsythe and Mr. Gerussi. Excellent arguments by both sides. Again, we appreciate your travel to Seattle, and we wish you safe travels home, and the case is submitted. Thank you. All rise.
judges: Lay , Goodwin, Gould